UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| EVERYDAY PEOPLE NYC LLC,<br><br>        Plaintiff,<br><br>v.<br><br>ROBLÉ ALI,<br><br>        Defendant. | Civil Action No. _____<br><br>**COMPLAINT**<br><br>JURY TRIAL DEMANDED |

**COMPLAINT FOR TRADEMARK INFRINGEMENT,
UNFAIR COMPETITION AND RELATED CLAIMS**

Plaintiff Everyday People NYC LLC ("Everyday People" or "Plaintiff"), by its undersigned attorneys Cowan, DeBaets, Abrahams & Sheppard LLP, hereby submits its complaint against defendant Roblé Ali ("Defendant"), as follows:

**NATURE OF THE ACTION**

1. This action arising from Defendant's infringement of Plaintiff's ownership and use rights in the word marks EVERYDAY PPL, Registration Number 4976495 (the "Registered Mark"), and EVERYDAY PEOPLE, registration pending, Serial Number 97783369 (the "Pending Mark"; together with the Registered Mark, the "Mark"), and his unlawful impersonation of Plaintiff in connection with a copycat website and hijacked social media accounts, along with breaches of contract and fiduciary duty and related claims.

2. Defendant used his position as a member of Plaintiff's LLC to gain access to Plaintiff's bank accounts and transfer money to himself in breach of the LLC's operating agreement and in violation of New York law. In an attempt to position himself as sole owner and operator of the Plaintiff's LLC, Defendant also took over some of Plaintiff's company social media accounts and

1

email accounts, and created a fraudulent website for the LLC to trick consumers into believing that he was the source of the Marks and the associated good will.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over this action pursuant to 15 U.S.C. §§ 1331 and 1338 because it arises under the federal Lanham Act relating to trademarks (15 U.S.C. § 1051 *et seq.*), and because this Court may exercise supplemental jurisdiction over Plaintiff's claims that arise under the laws of the State of New York and common law pursuant to 28 U.S.C. § 1367 because they are so related to the claims arising under the federal Lanham Act that they form part of the same case or controversy.

4. This Court has personal jurisdiction over Defendant because Defendant knowingly targeted Plaintiff and residents in this district with infringing acts; knowingly targeted residents of New York familiar with the Everyday People brand to impersonate Plaintiff; knowingly breached the LLC's operating agreement, which was entered into in New York and governed by New York law and contains a New York jurisdiction and venue clause calling for venue in Kings County; committed business torts targeted at Plaintiff and its managers and members in New York; and because Defendant conducts and/or conducted business at the relevant times in the state of New York.

5. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred here and because a substantial part of the property that is the subject of this action is located in this District, and because Defendant is subject to personal jurisdiction in this District.

## THE PARTIES

6. Everyday People is a limited liability company organized under the laws of New York with its principal place of business in New York.

7. Everyday People is in the business of creating live music events and experiences and is a globally recognized event brand with a particular focus on diversity and inclusion.

8. Defendant is an individual residing in Florida. Defendant is a former resident of New York, and upon information and belief, Defendant has been permanently domiciled in Florida as of 2021 and has no intention of moving back to New York.

9. Defendant is a founding member of Everyday People and owned a one-third interest from the organization's founding on June 5, 2013, until the Everyday People limited liability company operating agreement (the "Operating Agreement," a true and correct copy of which is attached hereto as Exhibit A) was ratified by written consent of the majority members on November 9, 2021, when his interest was lowered to 24% after two other members were added to Everyday People.

## FACTUAL BACKGROUND

10. Everyday People is a live music event experience and culture platform, which began putting on events in 2012 and was officially formed as an LLC on June 5, 2013. At that time its members at that time consisted of Defendant, Saada Ahmed, and Mohamed Hamad, each of whom owned a one third interest in the organization.

11. Also at that time, Defendant formed the LLC and opened a company bank account. Without the knowledge of Ahmed and Hamad, he listed himself as the sole member of the company when opening the bank account rather than listing all three members, and instead gave Ahmed and Hamad only signer privileges on the account.

12. In 2021, Hamad and Ahmed determined that the organization needed an operating agreement and thereafter created the Operating Agreement, a copy of which was provided to Defendant for review and comment on September 10, 2021.

13. Defendant did not return comments or provide input into the content or drafting of the Operating Agreement, other than to say he did not wish to share his ownership interest in the company.

14. On November 9, 2021, Ahmed and Hamad, who made up a majority of the Everyday People's membership interest, ratified the Operating Agreement, which granted a membership interest to Jemaine Buchanan and Demian Bolden, reducing Defendant's interest to 24%. A copy of the Operating Agreement was sent to Defendant on November 17, 2021, for his signature.

15. Defendant did not sign the Operating Agreement, nor did he respond to a November 23, 2021 letter from the undersigned law firm regarding the same.

16. Although Defendant did not sign the Operating Agreement, he is nevertheless bound by it because it was validly adopted by a majority-in-interest of the members of Everyday People at a meeting where a quorum was present.

17. The terms of the Operating Agreement established a board of managers consisting of Hamad, Ahmed, Buchanan and Bolden (collectively, the "Board of Managers"), who had authority to manage and control the company, including authority over banking. Defendant was not appointed to the Board of Managers but remained a member of Everyday People.

18. Because Defendant was not appointed to the Board of Managers, Defendant was not granted banking authority under the Operating Agreement and was not authorized to access Everyday People's master bank account (the "Master Account") or conduct any transactions on behalf of Everyday People, although he could access his personal company sub-account.

19. Although Defendant lacked authorization to access the Master Account under the Operating Agreement because Defendant opened the bank accounts and falsely listed himself as the sole member of Everyday People, and the other members did not know to change the

fundamental banking structure, he was still listed as an authorized representative on all company bank accounts.

20. In late 2022, Defendant began asking Bolden for advances on his share of member distributions. Bolden declined, explaining that Everyday People would need to maintain liquidity until financial audits were complete.

21. On January 23, 2023, without communicating with any other member, Defendant gained access to the Master Account and transferred $10,000 from the Master Account to his personal company sub-account.

22. Upon information and belief, Defendant sent an additional payment of $350 via Zelle transfer from the Master Account to a housekeeper in Miami, Florida.

23. Around this time, Defendant also made phone calls to people outside of Everyday People asking to get in touch with Ahmed and falsely claiming that Hamad and Bolden had embezzled funds from Everyday People.

24. On the morning of January 25, 2023, Bolden learned of the false embezzlement accusations against himself and Hamad, which prompted him to check the Everyday People bank accounts via online banking, where he learned of the unauthorized $10,000 and $350 transfers.

25. Bolden alerted the Board of Managers, who conducted an emergency meeting and gathered documents to provide to the Bank in order to remove Defendant's access to the Master Account.

26. Bolden went to a New York branch of the Bank to make changes to the banking authorizations and structures in order to prevent continued unauthorized activity by Defendant.

27. From the Bank, he learned that (1) Defendant was listed as the sole owner of Everyday People on the company accounts and (2) Hamad had been removed as a signer on all accounts.

28. At the request of Bolden and the Board of Managers, the Bank removed Defendant's Master Account access, restored Hamad's signer privileges, changed the ownership structure from listing Defendant as sole owner to listing all members of Everyday people and granted all members including Defendant visibility access to the Master Account.

29. In addition, because Defendant had transferred $10,000 to his personal company sub-account, Bolden transferred money to each of the other members' personal company sub-accounts in an amount reflecting their membership interest in Everyday People in order to make the member distributions equal.

30. Within the meeting minutes provided to the Bank by the Board of Managers, it was never explicitly stated that Everyday People is a manager managed company rather than a member managed company, so when the Bank made the changes requested by the Board of Managers, they did not bar Defendant from making further changes to the structure of the accounts.

31. Because the Bank was still treating Everyday People as a member managed company rather than a manager managed company, shortly after Defendant was removed from all accounts except his own, Defendant used his status as a member to regain access to the Master Account, remove signer privileges for other members on all accounts, and once again remove everyone other than himself as members with interest in Everyday People.

32. That same afternoon (January 25), Defendant provided a Miami, Florida branch of Chase bank ("Bank") with fabricated meeting minutes purportedly from an Everyday People company meeting which never actually took place, where the only member listed as present was Defendant (the "Fraudulent Minutes").

33. The Fraudulent Minutes were comprised of nonsense. The old business section reads, "Roble Ali, the SOLE owner of Everyday People NYC LLC says God Bless Em Ups!"; and the

6

new business section reads, "Due to the recent security breach, Roble Ali, the sole member of this company will be the only person with access to all of my corporate bank accounts."

34. Despite the facial falsity of the Fraudulent Minutes, the Bank granted Defendant full access to the Master Account and authority to change the account information so that Defendant had complete control of the Master Account rather than the Board of Managers.

35. Defendant changed the company banking structure back so that he was once again wrongfully listed as sole owner, removed the other members of Everyday People from all accounts and from online banking visibility, and wired approximately $169,000 in company funds to a bank account outside of the control of Everyday People.

36. On January 26, 2023, Bolden discovered that he no longer had access to the Master Account or any company sub-accounts and could not gain access to any accounts to determine how this had happened.

37. Bolden went to a Beverly Hills branch of the Bank and was unsuccessful in regaining control of the accounts because the accounts still listed Defendant as the sole member of Everyday People, and the Bank required that he provide yet another set of meeting minutes showing that Everyday People is a manager managed company, rather than a member managed company, and that Bolden had a membership interest.

38. On January 27, 2023, the Board of Managers commenced a second emergency meeting, this time compiling documentation of the legal structure and management of the company and creating minutes to provide to the Bank in order to show that Everyday People was manager managed and that Defendant was not the sole member, to regain access to the company accounts and prevent Defendant from making further changes.

39. During the meeting, the Board of Managers decided to appoint Bolden and Buchanan as the only authorized managers of the company with authority over banking. Bolden and Buchanan would therefore have exclusive authority to access the Master Account and make any changes in the eyes of the Bank. The Board of Managers also decided to remove Defendant as an authorized representative on all accounts, but to allow Defendant to remain a signer on his own sub-user account.

40. Bolden again met with Bank on January 30, 2023, and the Bank approved Bolden as authorized representative and signee on all accounts.

41. After the January 30, 2023 meeting, the Beverly Hills branch of the Bank contacted the Miami branch to commence an investigation. In addition, Bolden filed a complaint with the Miami branch.

42. Upon accessing the accounts, Bolden learned that Defendant had transferred a total of approximately $169,000 in company funds from the Master Account and from Ahmed's personal sub-user account to an external account with no affiliation to Everyday People. Defendant did not notify anyone of these transfers.

43. As a result of Defendant's fraudulent transfers, the Everyday People bank accounts now have a balance of approximately $1,200 across all accounts.

44. In the ensuing months since Defendant's wrongful actions regarding the Everyday People assets, he has continued to do everything in his power to harm the company and falsely hold himself out as the sole owner, including seizing control of Everyday People's previous website domain, everydaypplnyc.com, through which he turned off all business emails ending in everydaypplnyc.com, and causing members to miss important communications and go through the onerous task of creating a new website and new email addresses.

45. In addition, Defendant created a duplicate version of the real Everyday People website, everydayppl.nyc ("Everyday People Website"), at the domain www.everydayppl.co ("Infringing Website"), which looks virtually identical to the real website, further intending to mislead the public.

46. Defendant also changed the Everyday People TikTok account, @everydayppl, to be associated with his own email and phone number so he could control this valuable social media platform and so the members are unable to access it.

47. Defendant has taken over these accounts in order to mislead the public into believing that they are being run by Everyday People, all while he solely controls the websites and accounts in order to direct traffic to himself and continue his pursuit of taking over the company through fraudulent means.

48. Defendant is aware that Plaintiff owns a registration for the Registered Mark and that Plaintiff has been using the Pending Mark in commerce for many years. Defendant does not have any rights to control the Everyday People Marks, particularly given his extremely limited role and entitlements set forth in the Operating Agreement.

49. Not only does Defendant continue to willfully infringe on Everyday People's Marks, but he has continuously done so behind the backs of the other members of Everyday People with the goal of misleading consumers into believing that they are interacting with authentic Everyday People content when in fact he has created a false online presence for the company.

## CLAIMS FOR RELIEF
### COUNT I
**Infringement and Counterfeiting of a Registered Mark**

50. Everyday People repeats and realleges the allegations contained in prior paragraphs as though fully set forth herein.

51. Everyday People has continuously used the Registered Mark in interstate commerce in International Class 41 since on or before May 30, 2015, the date of first use reflected in the registration certificate attached hereto as Exhibit B.

52. Everyday People, as owner of all right, title, and interest in the Registered Mark, has standing to maintain an action for trademark infringement under 15 U.S.C. § 1114(a).

53. Defendant was actually aware that Everyday People is the owner of the Registered Mark when he infringed the Registered Mark by creating the Infringing Website, took over Everyday People's emails, and hijacked Everyday People's TikTok account, which he did without permission and with the intention of making the public believe that Everyday People was behind the Infringing Website, the stolen email domains, and the hijacked TikTok account, and thus that these assets reflected the true source of Everyday People's goods and services.

54. Defendant's intentionally confusing use of the Registered Mark in the Infringing Website URL (everydayppl.co), business email through Everyday People's former domain (everydaypplnyc.com), and in Plaintiff's TikTok handle (@everydayppl) and on the TikTok profile, on information and belief has deceived, and is likely to continue to deceive, the general public as to the source or origin of the goods and services Defendant purports to offer under the Registered Mark (which are the same goods and services under International Class 41) and is likely to deceive the public into believing that the Infringing Website, the stolen email domains, and the hijacked TikTok account are associated with, or authorized by, Everyday People.

55. Defendant's actions have been deliberate and committed with knowledge of Everyday People's rights and goodwill in the Registered Mark, as well as with bad faith and the intent to cause confusion, mistake and deception, and these actions constitution infringement of the Registered Mark under 15 U.S.C. § 1114(a).

56. Defendant's actions also constitute counterfeiting of a trademark given that Defendant has spuriously used the Registered Mark in an identical copy and is attempting to offer the exact same goods and services as Plaintiff, in direct competition with Plaintiff, all while posing as Plaintiff.

57. As a direct and proximate result of Defendant's infringing actions, Plaintiff has suffered irreparable injury, loss, and damage to its rights in the Registered Mark in an amount as yet unknown, but to be determined at trial, for which Everyday People has no adequate remedy at law, and unless Defendant's infringing activity is immediately enjoined, Everyday People will continue to suffer substantial and irreparable injury.

58. Because of Defendant's infringing activities, alleged herein, Everyday People is entitled to injunctive relief, Defendant's profits, Plaintiff's damages for the harm caused by the infringement, and any continuing harm as a result of Defendant's unlawful and infringing use of the Registered Mark, as well as other remedies provided by 15 U.S.C. §§ 1116, 1117, and 1118, and reasonable attorneys' fees and costs.

59. Plaintiff is also entitled to treble damages under 15 U.S.C § 1117(b) for his use of a counterfeit mark, or in the alternative, statutory damages under § 1117(c).

## COUNT II
### Infringement of an Unregistered Mark

60. Everyday People repeats and realleges the allegations contained in prior paragraphs as if fully set forth herein.

61. Everyday People has been using Pending Mark in commerce in, *inter alia*, International Classes 35, 38, and 41, since May 30, 2015. A true and correct copy of the trademark application for the Pending mark is attached hereto as Exhibit C.

62. Everyday People has standing to maintain an action for trademark infringement under 15 U.S.C. § 1125(a).

63. Defendant was actually aware that Everyday People is the owner of the Pending Mark when he infringed the Pending Mark by creating the Infringing Website (which prominently uses "EVERYDAY PEOPLE" on its landing page and "about" page), and hijacked Everyday People's TikTok account (which also prominently uses the Pending Mark), which he did without permission and with the intention of making the public believe that Everyday People was behind the Infringing Website and the hijacked TikTok account, and thus that these assets reflected the true source of Everyday People's goods and services.

64. Defendant's intentionally confusing use of the Pending Mark in the Infringing Website and TikTok profile, on information and belief has deceived, and is likely to continue to deceive, the general public as to the source or origin of the goods and services Defendant purports to offer under the Pending Mark (which are the same goods and services under International Classes 35, 38, and 41) and is likely to deceive the public into believing that the Infringing Website and the hijacked TikTok account are associated with, or authorized by, Everyday People.

65. Defendant's actions have been deliberate and committed with knowledge of Everyday People's rights and goodwill in the Pending Mark, as well as with bad faith and the intent to cause confusion, mistake and deception, and these actions constitution infringement of the Pending Mark under 15 U.S.C. § 1125(a).

66. As a direct and proximate result of Defendant's infringing actions, Plaintiff has suffered irreparable injury, loss, and damage to its rights in the Registered Mark in an amount as yet unknown, but to be determined at trial, for which Everyday People has no adequate remedy at law, and unless Defendant's infringing activity is immediately enjoined, Everyday People will continue to suffer substantial and irreparable injury.

67. Because of Defendant's infringing activities, alleged herein, Everyday People is entitled to injunctive relief, an award of Defendant's profits, Plaintiff's damages for the harm caused by the infringement, and any continuing harm as a result of Defendant's unlawful and infringing use of the Registered Mark, as well as other remedies provided by 15 U.S.C. §§ 1116, 1117, and 1118, and reasonable attorneys' fees and costs.

**COUNT III**
**Federal Unfair Competition/False Designation of Origin**

68. Everyday People repeats and realleges the allegations contained in prior paragraphs as though fully set forth herein.

69. Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), prohibits the use of any word, term, name, symbol or device in a way that is likely to cause confusion, mistake, or deception as to the origin, sponsorship, or approval of goods or services.

70. Defendant's use of the Registered and Pending Marks on a website designed to mirror the official Everyday People Website is likely to deceive consumers accessing the Infringing Website into believing that they are visiting the real Everyday People Website. This was intentional and part of a scheme by Defendant to undermine Everyday People and draw in unsuspecting consumers under the guise of genuinely representing the Everyday People brand and falsely designating the origin of Plaintiff's goods and services.

71. Further, Defendant's use of Everyday People's TikTok account and email addresses is part of Defendant's efforts to falsely designated himself as the origin of Everyday People's goods and services although he is not authorized to use the Marks on behalf of the brand, hold himself out as a representative of Plaintiff's brand, or otherwise designate himself as the origin of Plaintiff's goods and services, and is indeed actively causing harm to Everyday People behind the scenes.

72. Defendant's conduct is willful and a transparent attempt to sow confusion, cause mistake, and deceive customers to his own benefit and to the detriment of Everyday People.

73. Defendant's conduct has caused injury to Everyday People and will continue to damage Everyday People and confuse the public unless the activity is enjoyed by this Court. Everyday People has no other adequate remedy at law.

74. As a direct and proximate result of Defendant's willful violation of the Lanham Act, Everyday People is entitled to an award of Defendant's profits and its actual damages in an amount to be proven at trial, along with reasonable attorneys' fees pursuant to 15 U.S.C. § 1117, as well as remedies under 15 U.S.C. §§ 1116 and 1118.

## COUNT IV
### Breach of Contract

75. Everyday People repeats and reallages the allegations contained in prior paragraphs as though fully set forth herein.

76. Defendant is bound by the Operating Agreement under New York law as a member of Everyday People because the Operating Agreement was validly adopted by a majority-in-interest of the members.

77. As a non-manager member of Everyday People, Defendant lacks the authority afforded to the Board of Managers under the Operating Agreement to make unilateral decisions about company funds and to access the Master Account without approval of the Board of Managers.

78. Defendant breached the Operating Agreement when he surreptitiously gained control of the Master Account, including without limitation, by way of the Fraudulent Minutes, and removed the other members from the Master Account and their own personal company sub-accounts.

79. Defendant additionally breached the Operating Agreement when he withdrew funds from the Master Account and transferred them out of a company-controlled account, and upon

information and belief, comingled company funds with personal funds and used the purloined funds to pay personal expenses, which went beyond the scope of authority granted to members under the Operating Agreement.

80. Defendant's breach of contract has damaged Everyday People in an amount no less than $169,000.00, plus interest, reasonable attorneys' fees, costs, and disbursements thereon.

## COUNT V
## Breach of Fiduciary Duty

81. Everyday People repeats and reallages the allegations contained in the prior paragraphs as though fully set forth herein.

82. Should the Court find that Defendant is not bound by the Operating Agreement, he should be deemed to have been acting as a manager of a member-managed LLC, and thus would owe a fiduciary duty to the other member-managers.

83. In these circumstances, Defendant would owe a fiduciary duty of care, loyalty, and good faith to Everyday People and would have been obligated to act prudently and in good faith in the operation of the organization's business, to act in the organization's best interests, and to put the interests of the organization above his own.

84. Defendant breached his fiduciary duties of care, loyalty, and good faith by appropriating company funds for his own benefit and transferring them to his own personal company sub-account and to an unknown and, upon information and belief, personal bank account which has no company oversight or control, and, upon information and belief, using company money to pay for personal expenses.

85. Defendant breached his duty of loyalty and good faith by supplying the Bank with the Fraudulent Minutes, which contained misrepresentations about the company structure and incorrectly stated that Defendant was the sole owner of Everyday People, in order to gain full

authority over the Master Account and removing the other members from the Master Account and their own personal company sub-accounts.

86. Defendant further breached his duty of loyalty and good faith by repeatedly sabotaging Everyday People's websites and social media accounts in order to exact control over Plaintiff's online presence, and by blocking Plaintiff's members and managers out of their company email accounts, necessitating the creation of all new email accounts.

87. Everyday People has been damaged by Defendant's breach of his fiduciary duty in an in an amount no less than $169,000.00, plus interest, reasonable attorneys' fees, costs, and disbursements thereon.

## COUNT VI
### Unjust Enrichment and Constructive Trust

88. Everyday People repeats and reallages the allegations contained in the prior paragraphs as though fully set forth herein.

89. By reason of the forgoing conduct, including presenting a fabricated document to the Bank in order to gain control of the Master Account and transferring $169,000.00 to an account outside of company control (and upon information and belief, to a personal account, and for use for personal expenses), Defendant has profited and enriched himself unjustly at the expense and to the detriment of Everyday People.

90. Defendant had no contractual or other legal basis to transfer the funds as described herein.

91. By reason of the above, Everyday People has been damaged in an amount no less than $169,000.00.

92. Equity and good conscience require that Defendant makes restitution to Everyday People in an amount to be determined by the Court. To allow Defendant to continue to wrongfully retain

funds from the Master Account and the benefits conferred thereby at Everyday People's expense would be unjust.

93. Everyday People requests a constructive trust to be imposed on the funds that were transferred by Defendant out of the Master Account on or around January 27, 2023, and full details of all uses of the funds.

## COUNT VII
### Conversion

94. Everyday People repeats and reallages the allegations contained in the prior paragraphs as though fully set forth herein.

95. As explained above, Defendant improperly gained access to the Master Account and has converted at least the $169,000.00 in funds found therein for himself by transferring the funds beyond the authority granted to him under the Operating Agreement and for an unauthorized purpose.

96. Upon information and belief, Defendant has transferred the funds to his own personal account for his own use.

97. By providing the Bank with false documentation and gaining access to the Master Account, Defendant exercised dominion and control over personal property belonging to Everyday People in a sum certain of $169,000.00, thereby interfering with Everyday People's superior right of possession to same.

98. As a direct and proximate result of Defendant's wrongful conversion of Everyday People's funds, Everyday People has been damaged in an amount to be determined at trial but not less than $169,000.00 plus interest, reasonable attorneys' fees, costs, and disbursements thereon.

# **PRAYER FOR RELIEF**

WHEREFORE, Everyday People respectfully requests that it be awarded judgment as follows:

a. On the First Cause of Action, awarding Everyday People Defendant's profits and three times its actual damages arising from Defendant's infringement of the Registered Mark or, at Plaintiff's election, statutory damages for willfully counterfeiting Plaintiff's Registered Mark, as well as costs and attorney's fees;

b. On the Second and Third Causes of action, awarding Everyday People Defendant's profits and its actual damages for infringement of the Pending Mark and for Defendant's false designation of origin, as well as costs and attorney's fees;

c. On the Third Cause of Action, a ruling from the Court that Defendant willfully breached multiple provisions of the Operating Agreement, and that Defendant is liable to Everyday People for actual, incidental, and consequential monetary damages related to Defendant's breaches of the Operating Agreement, but not less than $169,000 plus interest, costs, and reasonable attorneys' fees (the shifting of which are provided for in the Operating Agreement);

d. On the Fourth Cause of Action, a ruling from the Court that Defendant breached the fiduciary duties he owed to Everyday People when he provided false information to the Bank in the form of the Fraudulent Minutes in order to take control of the Master Account, transferred funds outside of company control for his own personal benefit, and claimed to be the sole owner of Everyday People when in fact he only held a minority interest.

e. On the Fifth Cause of Action, a ruling from the Court that Defendant has been unjustly enriched by wrongfully obtaining company funds in an amount not less than $169,000 plus interest, costs, and reasonable attorneys' fees;

f. On the Sixth Cause of Action, a ruling from the Court that Defendant wrongly converted company funds in an amount to be determined at trail, but not less than $169,000 plus interest, costs, and reasonable attorneys' fees;

g. A ruling from the Court that under the circumstances, in equity and good conscience, Defendant should not be allowed to retain the funds obtained from the Master Account and must return the funds in an amount to be determined by the Court.

h. The imposition of a constructive trust on all monies transferred to Defendants' accounts and belonging to Everyday People.

i. That the Court affirm the removal of Defendant as a member of Everyday People for cause, consistent with Clause 6.9(b) of the Operating Agreement, and that Everyday People does not need to compensate Defendant for such removal due to his fraudulent, bad faith, and otherwise tortious conduct.

j. That the Court issue the following injunctive relief:

   a. preliminarily and permanently enjoin Defendant from directly or indirectly:

      i. holding himself out as a member, manager, or as being otherwise affiliated with Everyday People;
      ii. acting, doing business, or purporting to act or do business in any way on behalf of Everyday People;
      iii. accessing any Everyday People bank accounts, email accounts including those ending in everydaypplnyc.com, Dropbox or other filesharing accounts, company computers or other devices, company online or website accounts of any kind including everydaypplnyc.com and company social media accounts, and any other company assets;
      iv. making, using, or accessing any website account of any kind purporting to be an official website or account belonging to Everyday People, including www.everydayppl.co.

19

      v. using the EVERYDAY PPL and EVERYDAY PEOPLE marks, or any other mark, word, or name incorporating or confusingly similar to Everyday People's Marks;

     vi. representing by any means whatsoever, that Defendant and his alleged goods and services are associated in any way with Everyday People or its Marks;

    vii. from doing any other acts calculated or likely to cause confusion or mistake in the mind of the public or to lead others to believe that Defendant's products or services originate from or are the products or services of Everyday People, or are somehow sponsored by or associated with Everyday People; and

   viii. from otherwise unfairly competing with Everyday People or misappropriating Everyday People's good will;

b. order Defendant to:

      i. delete, disable, remove, or otherwise take down the Infringing Website everydayppl.co;

     ii. release and relinquish control over everydaypplnyc.com and restore control to Everyday People of business emails and accounts ending in everydaypplnyc.com; and

    iii. revert Everyday People's TikTok account (and any other social media account he has hijacked) back to Everyday People and remove his email and phone number from such account(s) and relinquish all control thereof.

    iv. issue a corrective statement, subject to approval by Plaintiff, announcing to the public that the Infringing Website, stolen email accounts, and hijacked TikTok account were not, during the relevant time period, controlled by Plaintiff and that he had unlawfully appropriated such assets for his own benefit, and clarifying that control has now been relinquished to Everyday People.

k. Granting such other further relief as to the Court appears just and proper.

Dated: New York, New York
      March 29, 2023

COWAN, DEBAETS, ABRAHAMS & SHEPPARD LLP

*/s/ Scott J. Sholder*
Scott J. Sholder
CeCe M. Cole
41 Madison Avenue, 38th Floor
New York, New York 10010
Tel.: (212) 974-7474
Fax: (212) 974-8474
ssholder@cdas.com
ccole@cdas.com
*Attorneys for Everyday People NYC LLC*