UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
EVERYDAY PEOPLE NYC LLC,

                              Plaintiff,

              -against-

ROBLÉ ALI,

                            Defendant.
-----------------------------------------------------------X

**REPORT AND RECOMMENDATION**
23 CV 2436 (NGG) (CLP)

**POLLAK**, United States Magistrate Judge:

       On March 29, 2023, plaintiff Everyday People NYC LLC ("Everyday People" or "plaintiff") commenced this action against defendant Roblé Ali ("Mr. Ali" or "defendant"), seeking injunctive relief and damages for alleged counterfeiting and infringement of plaintiff's registered trademark in violation of the Lanham Trademark Act of 1946 ("Lanham Act"), 15 U.S.C. §§ 1051 et seq., as well as breach of Everyday People's Operating Agreement and related claims. (See Compl.[1] ¶¶ 1, 50–98).

       Currently pending before the Court is plaintiff's motion for default judgment and for attorney's fees and costs, filed on October 23, 2023, and referred to the undersigned by the district court (the "Motion" or "Mot."). (ECF No. 10; see also Electronic Order, dated October 26, 2023). After reviewing plaintiff's submissions, and for the reasons set forth below, the Court respectfully recommends that the district court DENY plaintiff's Motion for default judgment without prejudice. The Court further recommends, *sua sponte*, that the district court vacate the certificate of default entered against defendant on July 10, 2023. (ECF No. 9).

---

[1] Citations to "Compl." refer to plaintiff's Complaint filed on March 29, 2023. (ECF No. 1).

1

FACTUAL BACKGROUND

Plaintiff asserts claims for: (1) Infringement of a registered and an unregistered Mark (First and Second Counts); (2) Federal unfair competition and false designation of origin (Third Count); (3) Breach of contract and fiduciary duty (Fourth and Fifth Counts); (4) Unjust enrichment and constructive trust (Sixth Count); and (5) Wrongful conversion of funds (Seventh Count). (Compl. ¶¶ 50–98). Plaintiff's Motion seeks $179,880.85 in monetary damages as well as injunctive relief. (Pl's Mem.[2] at 11–12).

Everyday People is a limited liability company organized under New York state law, with its principal place of business in New York. (Compl. ¶ 6). Everyday People characterizes itself as "a live music event experience and culture platform" focusing on "diversity and inclusion." (Id. ¶¶ 6, 10). Everyday People was allegedly founded on June 5, 2013, by three members: defendant Mr. Ali, Saada Ahmed, and Mohamed Hamad. (Id. ¶ 10). Defendant is alleged to be a "former resident of New York" who, as of 2021, resides in Florida. (Id. ¶ 8).

Plaintiff alleges that from the organization's founding on June 5, 2013, until November 9, 2021, each of the three founders "owned a one-third interest" in the company. (Id. ¶ 9). Plaintiff alleges that in 2021, founders Hamad and Ahmed "determined that the organization needed an operating agreement" and created one (the "Operating Agreement"), which intended to grant "membership and interest" to two additional members, Jemaine Buchanan and Demian Bolden, subsequently reducing defendant's interest to 24 percent. (Id. ¶¶ 12, 14). Plaintiff claims that defendant was provided with a copy of the proposed Operating Agreement "for review and comment on September 10, 2021," yet he refused to "return comments or provide input." (Id. ¶¶ 12–13). Plaintiff alleges that despite defendant's unwillingness to cooperate in drafting the

---

[2] Citations to "Pl's Mem." refer to plaintiff's Memorandum of Law in Support of Motion for Default Judgment, filed October 23, 2023. (ECF No. 10-1).

2

proposed Operating Agreement, owners Ahmed and Hamad, who made up "a majority of the Everyday People's membership interest," ratified the Agreement on November 9, 2021, and produced a copy for defendant to sign on November 17, 2021. (Id. ¶ 14). Plaintiff claims that defendant never signed the Operating Agreement, but that he is still "bound by it" because "it was validly adopted by a majority-in-interest of the members of Everyday People where a quorum was present." (Id. ¶ 16). The Operating Agreement established a "Board of Managers" that did not include defendant, although he "remained a member of Everyday People." (Id. ¶ 17).

Plaintiff alleges that although defendant was not on the Board of Managers and thus "lacked authorization to access" the organization's master bank account (the "Master Account"), defendant was "still listed as an authorized representative on all company bank accounts" since he had opened said accounts. (Id. ¶ 19). It is further alleged that when defendant opened the accounts, he "falsely listed himself as a sole member" of the organization on the account records. (Id.) On January 23, 2023, defendant allegedly "gained access to the Master Account" and made several unauthorized transfers from the Master Account, including a $10,000 transfer to "his personal company sub-account," and a $350 transfer via Zelle "to a housekeeper in Miami, Florida." (Id. ¶¶ 21–22).

Plaintiff alleges that defendant began to make "phone calls to people outside of Everyday People" in which he falsely claimed that Hamad and Bolden, two members of the Board of Managers, "had embezzled funds from Everyday People." (Id. ¶ 23). Based upon such accusations, Bolden began to investigate the activity on the Master Account, prompting him to learn that defendant had made unauthorized transfers of funds and had removed Hamad "as a signer on all accounts." (Id. ¶ 27). Plaintiff alleges that in response to these discoveries, on the

3

morning of January 25, 2023, Bolden "restored Hamad's signer privileges" and changed the structure of the account so that defendant was no longer listed as the sole owner, and all members had "visibility access" to the account. (Id. ¶ 28). Bolden also allegedly "transferred money to each of the other members' personal company sub-accounts in an amount reflecting their membership interest" in order to account for the $10,000 that defendant allegedly transferred to his account. (Id. ¶ 29).

Plaintiff alleges that since the Bank treated Everyday People "as a member managed company rather than a manager managed company," on the afternoon of January 25, 2023, defendant was able to use "his status as a member to regain access to the Master Account." (Id. ¶¶ 30–31). Plaintiff alleges that later that afternoon, after defendant regained access to the Master Account, he provided Chase Bank "with fabricated meeting minutes" that allowed the bank to grant defendant "authority to change the account information so that [d]efendant had complete control of the Master Account rather than the Board of Managers." (Id. ¶¶ 32–34). Plaintiff alleges that, using this control, defendant "changed the company banking structure" to once again list himself "as sole owner," thereby removing the other members "from all accounts and from online banking visibility." (Id. ¶ 35). Plaintiff further claims that after regaining sole ownership of the Master Account, defendant "wired approximately $169,000 in company funds to a bank account outside of the control of Everyday People." (Id.)

Plaintiff alleges that the following day, on January 26, 2023, "Bolden discovered that he no longer had access to the Master Account" and went to Chase Bank to regain control of the accounts. (Id. ¶ 36). However, Bolden's attempt to regain access to the accounts was unsuccessful "because the accounts still listed Defendant as the sole member of Everyday People, and the Bank required that plaintiff provide yet another set of meeting minutes showing

4

that Everyday People is a manager managed company, rather than a member managed company." (Id. ¶ 37). Accordingly, on January 27, 2023, the Board of Managers commenced an emergency meeting, during which it created minutes "to show that Everyday People was manager managed and that Defendant was not the sole member." (Id. ¶¶ 37–38). The Board of Managers also removed defendant's authorization on all accounts, and appointed Bolden and Buchannan "as the only authorized managers of the company." (Id. ¶ 38). It was not until regaining authorization on the accounts on January 30, 2023, that Bolden learned of defendant's $169,000 transfer to an unknown external account. (Id. ¶¶ 41–42). Everyday People alleges that due to defendant's "fraudulent transfers," the company maintains "a balance of approximately $1,200 across all accounts." (Id. ¶ 43).

      Plaintiff further alleges that following defendant's "fraudulent transfers," he "has continued to do everything in his power to harm the company and falsely hold himself as the sole owner." (Id. ¶ 44). Specifically, plaintiff claims that defendant has taken control of Everyday People's previous website and email addresses, and that he changed the organization's social media "to be associated with his own email and phone number." (Id. ¶¶ 44–46). Plaintiff claims that defendant's actions "mislead the public into believing that" defendant's website and social media accounts "are being run by Everyday People." (Id. ¶ 47). Plaintiff further claims that defendant's use of Everyday People's former website and social media accounts is defendant's effort to "willfully infringe" on Everyday People's registered and pending trademarks. (Id. ¶ 49). In addition to its claims of trademark infringement, plaintiff alleges that defendant has violated the terms of the Operating Agreement and breached his fiduciary duty to the other member-managers. (Id. ¶¶ 78, 82).

5

PROCEDURAL HISTORY

Defendant was allegedly served on May 25, 2023, at 7969 NW 2nd Street, Suite 294, Miami, FL 33126, a "private mailbox location" at which defendant purportedly "maintains a mailbox" (defendant's "Mailbox Address"). (ECF No. 7). Prior to serving defendant at the Mailbox Address, the process server unsuccessfully attempted service five times at defendant's residence located at 5701 SW 40th Court, West Park, FL 33023 (defendant's "Residential Address"), stating in his affidavit that on each attempt, there was "no answer or cars in the driveway." (Id.)[3]

Defendant did not answer or otherwise respond to the Complaint, and on July 10, 2023, the Clerk of Court entered a default against him. (ECF No. 9). Plaintiff thereafter filed its Motion for Default Judgment. In support of its Motion, plaintiff filed a Memorandum of Law; the affidavit of Demian Sinclair Boden (the "Boden Affidavit" or "Boden Aff.") (ECF No. 10-2); a copy of Everyday People's redacted bank statements (ECF No. 10-3); screenshots of the Everyday People website and defendant's allegedly infringing website (ECF Nos. 10-4, 10-5); a letter from Chase Bank (ECF No. 10-6); the declaration of plaintiff's counsel, Mr. Scott Sholder (ECF No. 10-7); and a proposed order for entry of default judgment (ECF No. 10-10).

The Honorable Nicholas G. Garaufis, United States District Judge, referred the Motion to the undersigned. (Electronic Order, dated October 26, 2023). On January 2, 2024, this Court issued an Order setting an inquest hearing for February 22, 2024, and instructed defendant to submit any papers in response to plaintiff's Motion for default judgment on or before February 1,

---

[3] During the inquest hearing held before this Court on February 22, 2023, plaintiff's counsel referred to the process server as "she." (ECF No. 17 at 3:19–25). However, in its letter to the Court, plaintiff refers to the process server as "he." (ECF No. 21 at 2). Given that the affidavit of service was signed by an individual named "Christian" (ECF No. 8-3), the Court refers to the process server as "he."

6

2024. (ECF No. 12). Plaintiff served a copy of that Order on the defendant on January 4, 2024. (ECF No. 13).

On February 21, 2024, the day before the hearing, plaintiff filed a mail receipt showing that plaintiff's envelope containing the notice of Motion, which had been mailed to defendant's Residential Address, was returned to the sender. (ECF No. 15). Defendant failed to make any filing by the stated deadline and failed to appear at the inquest hearing on February 22, 2024. (See Minute Entry, dated February 23, 2024). At the inquest hearing, this Court inquired as to plaintiff's several unsuccessful attempts at service at defendant's Residential Address. (Hr'g Tr.[4] at 5:23–25, 6:1–3). Plaintiff's attorney explained that he had "hired a private investigator," who identified defendant's Residential Address and Mailbox Address. (Id. at 3:14–15). He clarified that the process server was unable to locate defendant or speak to any other person at defendant's Residential Address, but that he successfully delivered the process to an authorized agent at the Mailbox Address. (Id. at 3:15–18). Counsel also noted that all subsequent filings had been mailed to both addresses "in an abundance of caution," and that the envelope marked "return to sender" received the previous day, was the copy of the Motion that had been mailed to defendant's Residential Address. (Id. at 3:19–25).

Approximately two months after the inquest hearing, on April 19, 2024, plaintiff sent a letter to the Court explaining that plaintiff had received from the Postal Service the original envelope containing plaintiff's Motion for default judgment, which had been sent to Defendant's Mailbox Address, marked "Return to Sender Unable to Forward" and "Return to Sender Box Closed." (ECF No. 18-1).

---

[4] Citations to "Hr'g Tr." refer to the Transcript of Civil Cause for Inquest Hearing held February 22, 2024, and filed on April 11, 2024. (ECF No. 17).

On June 28, 2024, this Court Ordered plaintiff to file a supplemental letter and affidavit explaining the sufficiency of service of all pleadings and documents under Rules 4 and 5 of the Federal Rules of Civil Procedure, as well as any other applicable rules or laws. (ECF No. 20). Plaintiff filed a letter in response to the Court's Order on July 3, 2024 (ECF No. 21), and thereafter served a copy of the June 28th Order and plaintiff's letter on defendant. (ECF No. 22). In that letter, plaintiff clarified that "[b]oth Plaintiff's mailings of its Motion for Default Judgment to Defendant's Residential Address (ECF 15) and Mailbox Address (ECF 18-1) have been returned to Plaintiff's counsel with 'return to sender notices.'" (ECF No. 21 at 2). However, plaintiff insists that "[p]laintiff should not be penalized for inexplicably returned mailings despite complying with its obligations under the applicable rules." (Id. at 4).

## DISCUSSION

The Court addresses the question of whether default judgment should enter against the defendants as to some or all of plaintiff's claims. As described in detail below, the Court concludes that plaintiff is not entitled to an entry of default judgment due to insufficient service of process on the defendant.

I. Legal Standard[5]

    A.    Default Judgment

Rule 55(a) of the Federal Rules of Civil Procedure provides that "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default." Fed. R. Civ. P. 55(a). Rule 55 sets forth a two-part procedure for entering a default judgment. First, the Clerk of Court enters a default by noting the defaulting party's failure to respond or appear. Id.

---

[5] Unless noted, caselaw quotations in this order accept all alterations and omit internal quotation marks, citations, and footnotes.

Second, if the defaulting party fails to vacate the entry of default pursuant to Rule 55(c), the appearing party may seek a default judgment to establish liability and, if proven, damages. Fed R. Civ. P. 55(b).

In determining whether a default judgment should be entered, the Second Circuit has cautioned that a default judgment is an "extreme sanction" that "must remain a weapon of last, rather than first, resort." Meehan v. Snow, 652 F.2d 274, 277 (2d Cir. 1981); see also Sheet Metal, Air, Rail & Transp. Workers Loc. Union No. 127 v. Frank Torrone & Sons, Inc., No. 14 CV 2224, 2018 WL 4771897, at *4 (E.D.N.Y. Oct. 3, 2018), adopting report and recommendation, 2018 WL 6161655 (E.D.N.Y. Sept. 4, 2018). While the Second Circuit has recognized the pressure on district courts "to dispose of cases that . . . delay and clog [their] calendar[s]" due to the litigants' "disregard of the rules," the Circuit instructs district courts to "maintain a balance between clearing [their] calendar[s] and affording litigants a reasonable chance to be heard." Enron Oil Corp. v. Diakuhara, 10 F.3d 90, 95–96 (2d Cir. 1993); see also Jeremiah v. 5 Towns Jewish Times, Inc., No. 22 CV 5942, 2023 WL 6593997, at *2 (E.D.N.Y. Aug. 9, 2023), report and recommendation adopted, 2023 WL 5703698 (E.D.N.Y. Sept. 5, 2023). Thus, in light of the "oft-stated preference for resolving disputes on the merits," defaults are "generally disfavored" and "doubt[s] should be resolved in favor of the defaulting party." Enron Oil Corp. v. Diakuhara, 10 F.3d at 95–96; see also Erwin DeMarino Trucking Co. v. Jackson, 838 F. Supp. 160, 162 (S.D.N.Y. 1993) (stating that courts must "supervise default judgments with extreme care to avoid miscarriages of justice"). Furthermore, "[Rule 55(b)] states that a judgment by default 'may' be entered under specified circumstances, not that it must." Erwin DeMarino Trucking Co. v. Jackson, 838 F. Supp. at 162. Accordingly, a plaintiff is not entitled to a default judgment as a matter of right simply because the defendant is in

9

default, and courts have significant discretion in deciding whether to enter default judgment, see, e.g., id., Jeremiah v. 5 Towns Jewish Times, Inc., 2023 WL 6593997, at *2.

B.  Service of Process

Before turning to the question of whether the defendant in fact defaulted, the Court must first address whether the defendant was properly served with the summons and Complaint. Rule 4 of the Federal Rules of Civil Procedure prescribes the manner in which service of process must be effected in order to subject a defendant to the court's jurisdiction. If a defendant does not receive service in compliance with Rule 4 and does not waive formal service, the court lacks personal jurisdiction over the defendant. See Martin v. New York State Dep't of Mental Hygiene, 588 F.2d 371, 373 (2d Cir. 1978); Michaelson v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 709 F. Supp. 1279, 1282 (S.D.N.Y. 1989) (stating that proper service on a defendant of a summons and complaint is a prerequisite to personal jurisdiction); Jackson v. Hayakawa, 682 F.2d 1344, 1347 (9th Cir. 1982) (holding that "[n]either actual notice . . . nor simply naming the person in the caption of the complaint . . . will subject defendant[] to personal jurisdiction if service was not made in substantial compliance with Rule 4").

Under Rule 4(e) of the Federal Rules of Civil Procedure, process may be served on an individual by:

> A. delivering a copy of the summons and of the complaint to the individual personally;
>
> B. leaving a copy of each at the individual's dwelling or usual place of abode with someone of suitable age and discretion who resides there; or
>
> C. delivering a copy of each to an agent authorized by appointment or by law to receive service of process.

Fed. R. Civ. P. 4(e)(2)(A)–(C). Rule 4 also provides that an individual may be served by "following state law for serving a summons in an action brought in courts of general jurisdiction

10

in the state where the district court is located or where service is made." Fed. R. Civ. P. 4(e)(1). When assessing the propriety of service under an applicable state statute, federal courts defer to the decisions of courts within that state. See Paige v. City of New York, No. 21 CV 11104, 2023 WL 3122989, at *2 (S.D.N.Y. Apr. 27, 2023); Mecca v. Lennon, No. 16 CV 1414, 2017 WL 1410790, at *3 (E.D.N.Y. Apr. 18, 2017). However, in order to satisfy due process, any alternative means of service must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950).

I. Analysis

   A. Service of Process

For the reasons set forth below, the Court concludes that defendant was not properly served with process and thus that the Certificate of Default should not have entered.

In its supplemental letter to the Court in support of its Motion, plaintiff describes its attempts at effecting service on defendant. Plaintiff states that its "counsel's private investigator" was "retained to conduct diligence on Defendant's last known whereabouts." (ECF No. 21 at 2). The private investigator allegedly identified two addresses at which plaintiff attempted service: 5701 SW 40th Court, West Park, FL, 33023 (defendant's Residential Address), and 7969 NW 2nd Street, Suite 294, Miami, FL 33126 (defendant's private Mailbox Address). (Id. at 1). Plaintiff claims that "five attempts were made to serve the Defendant at his Residential Address," on May 15, 16, 20, 22, and 23, 2023. (Id.) However, the process server reported that "in five attempts, no one at that address answered the door to the process server and there were no cars in the driveway." (Id.; see also Sholder Decl. ¶ 3; ECF No. 10-8). The process server states that he ultimately served defendant on May 25, 2023, by delivering a copy

11

of the Summons and Complaint to "Karla Martinez, a person in charge at the recipient's private mailbox location." (ECF No. 10-8).

As noted earlier, the summons and complaint can be delivered personally to the defendant, left with another individual "of suitable age and discretion" at the defendant's "dwelling or usual place of abode," or delivered through an authorized agent. Fed. R. Civ. P. 4(e)(2). Alternatively, an individual may be served by "following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located or where service is made." Fed. R. Civ. P. (4)(e)(1). Neither Rule 4(e)(2) nor New York law provide for service upon an individual by leaving a copy of the summons and Complaint at a private mailbox.[6] However, Everyday People claims that it properly effectuated service on the defendant under Florida Statute § 48.031(6)(a), which provides:

> If the only address for a person to be served which is discoverable through public records is a private mailbox, a virtual office, or an executive office or mini suite, substituted service may be made by leaving a copy of the process with the person in charge of the private mailbox, virtual office, or executive officer mini suite, but only if the process server determines that the person to be served maintains a mailbox, a virtual office, or an executive office or mini suite at that location.

(See also ECF No. 21 at 2).

In addressing the sufficiency of service under this statute, Florida courts have set out "three basic requirements to obtain substituted service:" "(1) that the address of record of the . . . registered agent was a private mailbox, (2) that the only address discoverable through public records . . . was a private mailbox, and (3) that the process server properly determined that the [defendant or their agent] maintains a mailbox at that location prior to serving the person in

---

[6] New York law provides that an individual may be served via personal delivery, two-step substituted service, service through an agent, so-called "nail and mail" service, or in any manner as directed by the Court. See N.Y. Civil Practice Laws and Rules ("C.P.L.R.") § 308 (setting forth the means of serving natural persons).

12

charge." Center for Individual Rights v. Chevaldina, No. 16 CV 29095, 2017 WL 3098790, at *3 (S.D. Fla. Feb. 21, 2017); see also Clauro Enterprises, Inc. v. Aragon Galiano Holdings, LLC, 16 So. 3d 1009, 1010–12 (Fla. Dist. Ct. App. 2009).[7] Under Florida law, "[t]he burden of proving the validity of service of process is on the plaintiff." Carter v. Lil' Joe Records, Inc., 829 So. 2d 953, 954 (Fla. Dist. Ct. App. 2002). Accordingly, in the instant case, the plaintiff bears the burden of proof in establishing that the three statutory requirements have been met. Id.; see also Clauro Enterprises, Inc. v. Aragon Galiano Holdings, LLC, 16 So. 3d at 1012.

Here, plaintiff has satisfied the first and third requirements, but not the second. The Mailbox Address provided by plaintiff corresponds to "Mail Hub," a commercial mail receiving agency. (ECF No. 14). Accordingly, the address appears to have been a private mailbox, and the Court finds that plaintiff has therefore satisfied the first requirement. See TID Servs., Inc. v. Dass, 65 So. 3d 1, 6 (Fla. Dist. Ct. App. 2010) (holding that the term "'private mailbox' . . . certainly includes a private mailbox service provided by a commercial mail receiving agency such as the UPS store").

Plaintiff has also satisfied the third requirement—that the private mailbox was associated with the defendant. Plaintiff claims that it "was given [the Mailbox Address] by the IRS" during a phone call in which an IRS representative told a member of Everyday People "that there was an address on file that had recently been changed under Defendant's name." (ECF No. 21 at 1). Plaintiff further notes that the same Mailbox Address was later "confirmed by Plaintiff's counsel's private investigator retained to conduct diligence on Defendant's last known

---

[7] While the relevant Florida statute does not provide a clear definition of "public records," Florida law defines that term elsewhere as follows: "all documents, papers, letters, maps, books, tapes, photographs, films, sound recordings, data processing software, or other material, regardless of the physical form, characteristics, or means of transmission, made or received pursuant to law or ordinance or in connection with the transaction of official business by any agency." Fla. Stat. § 119.011(12).

13

whereabouts." (Id. at 2). Given that plaintiff obtained the same Mailbox Address from both the IRS and a private investigator, the Court finds that plaintiff has satisfied the third requirement to obtain substitute service under Florida Statute § 48.031(6)(a).

With respect to the second requirement—that the "only address discoverable through public records" for the defendant "was a private mailbox"—plaintiff cites Center for Individual Rights v. Chevaldina, which states that the plaintiff has "no obligation . . . to contact Defendant ahead of time or make any other efforts to locate Defendant" if plaintiff is able to locate a private mailbox. 2017 WL 3098790, at *4. However, in Center for Individual Rights, the court also determined that "there were no other publicly available addresses for Defendant other than the mailbox." Id. at *3. Conversely, when applying the same statute, Florida state courts have held that substitute service on a mailbox address was not proper when there were other known addresses associated with the defendant, in addition to the private mailbox address. See Clauro Enterprises, Inc. v. Aragon Galiano Holdings, LLC 16 So. 3d at 1012–13 (holding that service was not proper because plaintiff "did not and could not meet its burden of establishing that the only address" for the defendant "discoverable through public records was a private mailbox"); TID Services, Inc. v. Dass, 65 So. 3d at 2 (reaching the same conclusion when applying the analogous provision applicable to effecting substitute service upon a corporation).

In the instant case, it is clear that defendant's private Mailbox Address is not the *only* known address associated with defendant. In its letter to the Court, plaintiff states that "based on the information provided to the process server and through his own diligence, the process server filed an affidavit of service stating that the Complaint was served at the Mailbox Address which is 'the only address known after reasonable investigation and after determining that the person or business to be served maintains a mailbox at this location.'" (ECF No. 21 at 2 (quoting ECF No.

14

8-3)).  However, in his affidavit, the process server also clearly states that he made five attempts to serve the defendant at another address, the Residential Address identified by plaintiff's private investigator, before serving defendant at the private Mailbox Address.  (ECF No. 8-3).  Counsel confirmed as much at the inquest hearing held before this Court on February 22, 2024, during which he stated that plaintiff "hired a private investigator to look into where" defendant was, and that "[s]he determined that there was both a physical address," defendant's Residential Address, "and what's essentially a private mailbox" address.  (Hr'g Tr. at 3:14–17).  While, as plaintiff notes, it is not plaintiff's burden to find another address for defendant if the only known address is a private mailbox, plaintiff had already identified a Residential Address at the time service was effected at the Mailbox Address.

Plaintiff does not purport to have taken any steps to confirm that defendant was no longer residing at the Residential Address.  Indeed, during the inquest hearing held before this Court on February 22, 2024, the Court asked plaintiff's attorney if, during the five unsuccessful attempts of service at defendant's Residential Address, the process server encountered anyone who reported that defendant "doesn't live [t]here," or if "just nobody was there when [he] tried."  (Id. at 5:3–8).  In response, plaintiff's counsel confirmed that each of the five times, there was simply nobody there.  (Id. at 5:9–22).  Counsel did not indicate whether the process server had confirmed if defendant still lived at the Residential Address.  The five attempts at service were made over a period of nine consecutive days during which the defendant may simply have been out of town.  Thus, the Court suggested that perhaps defendant "wasn't there at the time and now he is, and that's why he sent it [the notice of motion] back."  (Id. at 5:23–25).  Counsel did not contest or otherwise respond to this comment about the possibility that defendant was simply not home at the times of attempted service, and plaintiff does not do so now.  Rather, plaintiff

15

conveniently assumes that the process server's inability to serve defendant at that address after several attempts means that it no longer constituted a publicly available address. That is not the case.[8]

Having discovered the Residential Address as a potentially viable place of service, it was plaintiff's burden to establish that defendant had moved on from that address before effecting substituted service under Section 48.031(6). See Clauro Enterprises, Inc. v. Aragon Galiano Holdings, LLC, 16 So. 3d at 1012 (stating that the plaintiff bears the burden of providing "definitive evidence" that there is no other address associated with the defendant besides a private mailbox).[9] Since plaintiff has failed to satisfy one of the three prerequisites for substituted service under Florida Statute § 48.031(6)(a), the Court finds that defendant was not properly served with a copy of the Summons and Complaint.

## CONCLUSION

In light of the above, the Court respectfully recommends that the district court: (1) deny plaintiff's Motion for default judgment without prejudice;[10] and (2) vacate the Clerk's certificate

---

[8] While plaintiff does not detail the specific steps taken by the private investigator to discover defendant's Residential Address or Mailbox Address, plaintiff states that it is able to provide a report from the investigator. (ECF No. 21 at 2). However, regardless of how the investigator identified these addresses, the fact is that plaintiff identified two addresses and has not met its burden of proving that defendant is no longer residing at the Residential Address such that substitute service was appropriate under Section 48.031(6).

[9] Given that an individual may be served following the law "in the state where the district court is located," plaintiff is also able to serve defendant according to New York law. Fed. R. Civ. P. (4)(e)(1). One of the ways in which an individual may be served under New York law is "nail and mail," a two-step procedure that involves "affixing the summons to the door" of an individual's actual dwelling place or usual place of abode and "mailing the summons to such person at his or her last known residence." C.P.L.R. § 308(4). In the instant case, the method of "nail and mail" may be an appropriate means of effectuating service if plaintiff can verify that the Residential Address is still defendant's dwelling place or usual place of abode. See Eisenberg v. Lin, No. 94 CV 2870, 1995 WL 468285 (E.D.N.Y. Jul. 26, 1995) (indicating that although the court was located in New York and although plaintiff failed to satisfy the requirements for "nail and mail" service, plaintiff *could* have used that method of service on a Florida address in compliance with Rule 4(e)(1) because New York law provides that "service outside of New York upon a non-resident of the state may be made in the same manner as service is made within the state" (citing C.P.L.R. § 313)); Bozza v. Love, No. 15 CV 3271, 2015 WL 4039849 at *1 (S.D.N.Y. Jul. 1, 2015) (holding that under New York law, "the same methods that are used to serve process on a defendant located in New York must also be used when service is made outside of New York").

[10] Even if the court were to find that defendant had been properly served with the summons and Complaint, this Court would nonetheless recommend that plaintiff's Motion be denied, as the record suggests that defendant

16

of default entered against defendant pursuant to Rule 55(c) of the Federal Rules of Civil Procedure.[11]

Any objections to this Report and Recommendation must be filed with the Clerk of the Court, with a copy to the undersigned, within fourteen (14) days of receipt of this Report. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2); see also Fed. R. Civ. P. 6(a) (providing the method for computing time). Failure to file objections within the specified time waives the right to appeal the District Court's order. See, e.g., Caidor v. Onondaga Cnty., 517 F.3d 601, 604 (2d Cir. 2008).

The Clerk is directed to send copies of this Report and Recommendation to the parties either electronically through the Electronic Case Filing (ECF) system or by mail.

**SO ORDERED.**

Dated: Brooklyn, New York
August 4, 2024

*Cheryl L. Pollak*
Cheryl L. Pollak
United States Magistrate Judge
Eastern District of New York

---

was not adequately notified of defendant's Motion for Default Judgment. In its July 3, 2024, letter to the Court, plaintiff confirmed that "Plaintiff's mailings of its Motion for Default Judgement to [both] Defendant's Residential Address . . . and Mailbox Address . . . have been returned to Plaintiff's counsel with 'return to sender notices.'" (ECF No. 21 at 2 (citing ECF Nos. 15, 18-1)). While there is no clear standard as to what plaintiff must prove to show that defendant received its Motion for default judgment, courts have previously entered default judgments and later vacated them because it was determined that the defendant never received the motion for default judgment. See United States v. $3,700 in U.S. Currency, No. 04 CV 5944, 2011 WL 3502021, at *3 (S.D.N.Y. Aug. 9, 2011) (holding that "[w]here notice of a motion for default judgment is required, but not given, such a judgment entered without notice *must* be vacated as a matter of law" (citing Press v. Forest Labs., Inc., 45 F.R.D. 354, 357 (S.D.N.Y. 1968))). The same principle applies here. Plaintiff was required to notify defendant of its Motion for default judgment. Given that both mailed copies of the Motion and related papers were returned to sender, the Court cannot be certain that defendant was in fact notified of the Motion.

[11] The Court *sua sponte* recommends that the default itself be vacated, as both default and default judgment are ordinarily vacated for insufficient service of process. Criollo v. NY Fine Interiors Inc., No. 19 CV 5974, 2021 WL 1200318, at *5 (E.D.N.Y. Mar. 3, 2021) (quoting In re Worldwide Web Systems, Inc., 328 F.3d 1291, 1299 (11th Cir. 2003)), report and recommendation adopted, 2021 WL 1193082 (E.D.N.Y. Mar. 30, 2021).